IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 17, 2016

**MICHAEL E. STEWART v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Polk County**
**No. 09-090   Andrew Freiberg, Judge**
**Carroll L. Ross, Judge**

**No. E2015-00418-CCA-R3-PC – Filed June 29, 2016**

The Petitioner, Michael E. Stewart, appeals the Polk County Criminal Court's denial of his petition for post-conviction relief from his 2005 convictions for first degree premeditated murder, first degree felony murder, kidnapping, and tampering with evidence and his effective sentence of life plus eight years. The Petitioner contends that (1) the post-conviction court failed to make proper findings of fact and conclusions of law relative to each ineffective assistance of counsel claim and (2) he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Michael E. Stewart (on appeal), Pikeville, Tennessee, Pro Se; Justin Woodward (partial post-conviction hearing), Ringgold, Georgia; and Casey Stokes (partial post-conviction hearing), Georgetown, Tennessee, for the appellant, Michael E. Stewart.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Stephen Crump, District Attorney General; and Drew Robinson and Cynthia LeCroy-Schemel, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's assaulting Willard Trentham, which resulted in the victim's death. The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

Detective Joe Price of the Polk County Sheriff's Department testified that he was working as a patrol officer around 11:00 p.m. on July 20, 2002, when he was dispatched to the Ladd Springs area regarding a possible fight. He said that it took him about fifteen to twenty minutes to arrive and that although no one was present when he reached the location, he found a shoe, some loose change, and what appeared to be blood on the road. He said he received a dispatch at 12:30 a.m. on July 21 to go to the home of Paul and Wanda Stewart regarding a possible death. He said that when he arrived, Officer Epperson was already there and directed him to the back seat of a red Chevy Corsica parked in the driveway. He said the victim was dead on the back seat. He said that the defendant, Wanda Stewart, and Samantha Bivens were present and that the defendant was placed in custody on the basis of some outstanding warrants. He said that as he and Officer Epperson were securing the scene, he saw a shoe on the front porch that was the mate to the one he had seen earlier when he responded to the fight call on Ladd Springs Road. He said the victim was not wearing shoes. He identified two shoes as the one he found at the scene of the fight call and the one he found at the Stewart residence.

Brad Stamey testified that he was a friend of the defendant. He said that on July 20, he had just been released on parole and snuck across the Tennessee-Georgia state line to visit his parents, Kenneth and Sue Stamey, who were camping. He said the victim, Donnie Payne, Junior Swinford, and Diane Trentham were at the campsite, as well. He said the defendant and the defendant's girlfriend Samantha arrived around dusk and stayed for about two or three hours. He said the defendant was not his usual self and "had an attitude" and was "outgoing about everything." He said that the defendant had wrecked his car by sliding off a bank and that the defendant and Samantha were brought to the campsite by someone who gave them a ride. He said the defendant's car was later removed by a tow truck and brought to the campsite. He said the defendant and the victim were talking, hugging, and interacting normally. He said that people were drinking alcohol but that he was not one of them. He acknowledged having said in his preliminary hearing testimony that he had been drinking but explained that he misunderstood the question. He said the victim was intoxicated and that the defendant was drinking but not intoxicated. He said the victim left the campsite about fifteen minutes before the defendant.

Mr. Stamey testified that a short time later, he, his father, and Donnie Payne left to purchase beer and cigarettes at a Golden Gallon store. He said

-2-

that as they came around a curve, he saw the defendant parked on the side of the road and the victim's car with steam coming out of it. He said there was damage to the rear bumper of the defendant's car and the muffler was dragging. He said that the victim sped away and that the defendant pounded the top of his car, screamed, "I'm going to kill that son-of-a-b----," and followed the victim.

Mr. Stamey testified that he continued driving and came upon the victim and the defendant a second time at a four-way stop. He said the defendant was pulling at the window and door of the victim's car, picked the victim up out of the car, and slapped him with an open hand "no more than three times." He said the victim's head hit the bumper of one of the cars. He also described the victim as sitting on the ground bleeding. He said he got out of his car and told the defendant not to hit the victim anymore. He said the defendant stated, "Somebody's going to pay me for that g------ car, boy." He said he tried to calm the defendant. He said he never heard the defendant tell the victim he was going to kill the victim.

Mr. Stamey testified that he took the victim from this location in the victim's car. He said that he wanted to take the victim for medical attention. He described the victim as being in "bad shape" with blood coming from his ears, mouth, and nose, his eyes swollen, and making a gurgling sound. He said the victim was trying to tell him to go to the victim's daughter's house, but Mr. Stamey did not know where it was. He said that the victim's car was not running well and that he decided to stop at the house of Wanda Stewart, the defendant's mother, to use the telephone to call for an ambulance. He said, however, he was not permitted to use Mrs. Stewart's telephone. He said that while he was at the door trying to get permission to use the telephone, the defendant drove up, removed the victim from the car, and began "roughing him up again."

Mr. Stamey testified that the defendant's father Paul intervened to get the defendant away from the victim. He said that after the defendant became calm, the defendant took the victim to the porch and sponged his face. He said that he was scared because he was on parole and in Tennessee illegally, and that he wanted the defendant and Samantha to drop him at his parents' campsite and take the victim for medical care. He said that they, however, did not realize the severity of the victim's situation. He said that when they reached the campsite, the victim's breathing was shallow, he started gurgling more, and his eyes were rolled to the back of his head. He said they got him

out of the car and tried to give him mouth-to-mouth resuscitation. He said that he was unaware of anyone at the campsite having a cellular telephone. He said that the victim was placed back into the car and that Samantha drove away with him. He said the defendant, who at first planned to remain at the campsite, ran after the car to go with Samantha and the victim. He said that before the defendant left, the defendant said, "Oh, God, what can I do? What am I gonna do?" He said the defendant also made a statement that he "didn't give a f--- if [the victim] died or not."

Mr. Stamey testified that his parents took him home that evening. He said they did not call to see whether the victim had been taken to the hospital and assumed that the defendant and Samantha had done so.

Donnie Payne testified that his wife was Brad Stamey's sister. He said that he was at the campsite on the night of July 20 when the defendant and the victim were present. He said the defendant was doing "crazy things" and acting as if he were on drugs. He said the defendant was trying to pick fights.

Mr. Payne testified that the defendant left the campground about 7:30 p.m. and that the victim left between thirty minutes and an hour later. He said he went that evening with the group to buy cigarettes. He testified that he drove and denied that he was trying to protect Brad Stamey by saying that he drove. He said that on the drive, he saw headlights from two cars coming toward him and that he pulled to the side of the road. He said one of the cars was the victim's, which the defendant was "butting the side of . . . trying to knock [the victim] off the road." He said the defendant dragged the victim out of his car by his hair and began beating him with his fists. He said he saw the defendant land at least ten to twenty punches to the victim's head, neck, and chest. He said the victim ended up on the ground, and he said he saw the defendant kick and stomp the victim a time or two on the chest and ram the victim's head into a car bumper. He said that he never saw the victim try to hit the defendant or try to block the blows and that the victim was trying to get away from the defendant. He said the defendant was mad, cursed, made statements about the victim hitting his car, and told the victim he would kill him. He described the victim as large but old and unable to hold his own against the defendant. He said that the victim was rendered helpless and that the victim's face was covered in blood. He said Brad Stamey had intervened during the beating but that the defendant slung Mr. Stamey away. He said that this was the only altercation he saw between the defendant and the victim and that he had not seen the defendant beating on the roof of a car.

Mr. Payne testified that two or three people stayed with the victim after the beating. He said he returned to the campsite. He said he did not see the defendant that night at the campsite. He said "they" brought the victim to the campsite and dumped him on the ground the next day. He said the victim was dead. He said he did not see the defendant when the victim was brought back to the campsite.

Mr. Payne acknowledged that he had poor vision in one of his eyes since having a stroke in July 2004. He also acknowledged that he could not see well at night. He said he had been a friend of the victim's for forty to forty-five years.

Mr. Payne testified that he was not drinking on the day of the incident but that he could smell alcohol on Brad Stamey, although he never saw Mr. Stamey drinking. He said he did not think Kenneth Stamey was drinking.

Kenneth Stamey testified that the defendant was his step-grandson whom he had helped raise. He said that on July 20, he and his wife were camping with several other people on Sand Creek. He said the defendant arrived around 3:00 or 4:00 p.m. with Samantha. He said that the defendant had driven into a ditch but that someone with a tow truck had pulled the car out of the ditch. He said the defendant was drinking beer but was not violent. He also said the victim was drinking and was intoxicated. He said there was no disagreement between the victim and the defendant at the campsite. He said the defendant left before he left with Brad Stamey and Donnie Payne to get beer. He said that he and his son did the driving and that Mr. Payne did not drive on this trip.

Mr. Stamey testified that on the way, they saw the defendant beating on his car because the victim had run into the defendant's car, although they did not see the wreck happen. He said the defendant said, "I'll beat the h--- out of that son-of-a-b----." He said that they followed the defendant and the victim and that at another location, Brad Stamey jumped out of the car and tried to talk the defendant out of hitting the victim, to no avail. He said that the defendant was mad because his car had been hit and that he was hitting the victim and saying he did not care if he killed the victim. He said that the victim fell to the ground while the defendant was assaulting him and that the victim tried to get up. He said he did not see the defendant kick the victim. He said that he did not see the defendant ram the victim's head into a car bumper but that he heard a loud thud. He said that after the altercation was

over, the defendant and Brad had to put the victim into the victim's car, that Brad stayed behind to take the victim for medical assistance, and that the rest of his group went back to the campsite.

Mr. Stamey testified that later that evening, the defendant returned to the campground with the victim. He described the victim as "kind of blue around the mouth" but not looking "like he was beat or to pieces or nothing, or beat up bad or nothing." He said, however, the victim was unconscious and breathing "real low." He said his wife attempted to give the victim CPR but was unsuccessful. He also said he thought that Samantha was going to take the victim to the hospital but that he understood she had not. He said the defendant was upset and crying and wanted the victim to be taken to the hospital but also made the statement, "They'll give me 20 years." He said no one at the campsite had a cellular telephone. He said he left to take his son back to Georgia.

Hazel "Sue" Stamey testified that the defendant was her grandson and that Brad Stamey and Kenneth Stamey were her son and husband, respectively. She said she was camping on July 20, 2002. She said the defendant visited them at the campsite and was drinking beer and acting as if he were "on pills." She said he was "happy-go-lucky." She said the defendant left the campsite about 3:00 or 4:00 p.m. She described the victim as "drunk" by this point and said he left thirty minutes to an hour after the defendant, after saying he was going to visit his daughter.

Ms. Stamey testified that later that evening, the defendant, Samantha, and Brad Stamey brought the victim to the campsite. She said that she attempted CPR but that the victim needed medical treatment. She said that the victim's face was blue but that he was not bleeding. She did not know whether the victim was breathing. She said that she was unable to help the victim, that she was scared, and that she said the victim needed to go to the hospital. She said she made a statement to the defendant, "You ought to be ashamed," and that the defendant responded that he did not give a d---.

Ms. Stamey testified that it was possible the defendant was upset and crying after he returned to the campsite with the victim. However, she said she did not recall that having happened.

David Guy testified that he was the assistant special agent in charge of the East Tennessee District of the Tennessee Bureau of Investigation (TBI)

-6-

and that he was called to a crime scene at a residence on July 21 at 12:40 a.m. He said that when he arrived, there was a person lying in the back seat of a Corsica car and that the person had experienced extreme blunt trauma from the neck to the top of the head. Using photographic exhibits, Agent Guy described the victim's injuries.

Agent Guy testified that due to the size of the crime scene and the number of items of evidence he saw, he called the violent crime response team to process the residential scene. He said the violent crime response team also processed the two roadside scenes but did not process the campsite. He said that at one of the roadside scenes, parts of vehicles were recovered and that at the other, coins, blood, and a shoe were found. He said a shoe which matched the one found on the roadside was recovered on the front deck at the residential scene. He said he went to the campsite and recovered a blanket from Mrs. Stamey.

Using a photograph, Agent Guy described damage to a gray Oldsmobile, which he said belonged to the victim. He said that the damage consisted of a broken taillight lens and that the pieces were on the ground beneath the car in the photograph. He said this meant the damage occurred at that location. He also described damage to the front of the car, consisting of old damage for which there was no debris at the scene, and new damage with parts at the scene.

Agent Guy also identified a photograph of a red Neon, which he said belonged to the defendant. He said the Neon did not have front-end damage. He said another photograph depicted slight damage to the rear bumper of the Neon.

Agent Guy testified that there were other vehicles at the residential crime scene. He said that one of them, a red Chevrolet, had damage which appeared to have occurred at that location. He based this conclusion on debris that was present.

Agent Guy testified that EMS workers had been on the scene before he arrived. He did not know what procedures they performed on the victim.

Agent Guy testified that in his experience, it was possible for two cars to collide and the damage to one to be much greater than to the other. He

offered his opinion that it was possible the victim's car hit the back of the defendant's car despite the varying amount of damage to the two cars.

TBI Agent Shelly Betts testified that she was a forensic scientist assigned to the firearms identification unit of the TBI Laboratory and was a member of the violent crime response team. She was allowed to testify as an expert in forensics. She stated that she went to the residential crime scene. She said there were four vehicles, one of which had a transmission fluid trail leading from the end of the driveway. She said there were numerous broken car pieces around the cars and blood spatter on the gravel. She reported that there appeared to be a drag mark from behind a red Neon to a maroon Corsica and that the victim's body was in the back seat of the Corsica.

Agent Betts identified sketches of the scene which reflected the location where evidence was recovered. She also identified photographs taken at the scene. Using these exhibits, which reflected the scene both inside and outside the residence, she testified about the location of the evidentiary items collected and identified them. She noted that broken pieces of red plastic were on the ground behind the Oldsmobile and that what appeared to be blood was in numerous places, both inside and outside the house.

Hunter Greene, a Special Agent Forensic Scientist with the TBI, testified as an expert witness in serology and latent print examination. He stated that he compared known blood samples from the defendant and the victim with evidence collected. He said that blood that DNA testing could not exclude as having come from the victim, but that was also not the defendant's blood, was found on a pair of shorts and sections of linoleum that were removed from the residence. He determined that the victim's DNA was present in blood on paper towels collected from a trash can in the living room. He said that based upon its pattern on the paper towels, the blood appeared to have been wiped onto the towels. He said the victim's blood was also on a t-shirt from a trash can in the laundry room. He determined through DNA testing that the victim's blood was also collected from the deck and the ground between the Oldsmobile and the Neon and from the upholstery in the back seat of the Oldsmobile. He said human blood was present on a sandal from the laundry room floor, an athletic shoe from the laundry room, a shoe from the deck of the residence, and two shoes from Wanda Stewart, but he did not perform testing to identify the source due to the small quantity of blood. He determined that human blood had been collected from the door area of the home but that DNA testing was inconclusive. For another sample collected

from the door area, he determined that the sample contained blood and the victim's DNA. He said test results revealed that human DNA and blood were on a mop from the kitchen, but he said he was not able to get a DNA profile due to the condition of the sample. He said human blood was also present on the back bumper of the Oldsmobile.

Agent Greene testified that a sample taken from one of the roadside crime scenes contained blood and the victim's DNA. He said a blanket from the campsite contained human blood but that he was unable to identify any DNA.

Agent David Guy was recalled by the State and testified that he first saw the defendant on the afternoon of July 21, the day after he responded to the crime scene. He said he looked for injuries on the defendant and saw none. He said the defendant reported that his big toe was sore but that the toe did not appear to be injured. He said the defendant did not appear to be impaired. He said he also observed Samantha Bivens, Brad Stamey, and Kenneth Stamey, none of whom appeared to have any injuries.

Dr. Amy McMaster testified as an expert in forensic pathology about her autopsy of the victim. She said the victim appeared older than the reported age of sixty-five and had numerous and significant injuries to his head and neck, including contusions, abrasions, and lacerations. She also observed bleeding of the brain. She said that due to the number and extent of the injuries, significant force from multiple blows were involved. She said the victim also had fractures of the thyroid cartilage and hyoid bone, both structures in the neck, which could be caused by strangulation or significant blunt trauma. She said the thyroid cartilage fracture could be caused from stomping the neck and that gurgling could be consistent with a person having this type of injury. Dr. McMaster stated that the victim had multiple bruises on his chest and back, multiple linear and round scratches on his back and left hip, and a brush burn type abrasion on his back. She said the bruises on the victim's torso were not consistent with resuscitation efforts. She said that the victim's arms, legs, and right foot were bruised and that the bruises were consistent with stomping injuries.

Dr. McMaster testified that a sample of the victim's blood showed a .212 percent ethanol level. A second sample taken from the victim's subdural hematoma showed a .307 percent ethanol level. She said he had salicylate, also known as aspirin, in his blood, as well. In Dr. McMaster's opinion, the

higher subdural ethanol level meant that the victim probably had not died immediately after his head injury. She said that the victim had several potentially fatal injuries which combined to cause his death. She said the cause of death was blunt force trauma. She acknowledged that it was possible for a person to be bruised from excessively forceful resuscitation efforts. She excluded alcohol as a factor in the victim's death.

*State v. Michael E. Stewart*, No. E2007-00841-CCA-R3-CD, 2009 WL 1328871, at *1-7 (Tenn. Crim. App. May 13, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009).

The Petitioner filed the instant petition for post-conviction relief alleging he received the ineffective assistance of counsel on multiple grounds. He also alleged that the selection of the grand and petit juries was unconstitutional, that the evidence was insufficient to support his convictions, that the trial court lacked jurisdiction, that the State failed to provide information related to plea agreements with its witnesses, that prosecutorial misconduct occurred during the trial, that the State failed to disclose exculpatory evidence, that a fatal variance existed between the indictment and the evidence presented at the trial, and that the trial court committed multiple errors before and during trial and during sentencing.

At the post-conviction hearing, trial counsel testified that during jury selection, the trial court ran out of potential jurors and that police officers brought people into the courtroom from the street to serve as potential jurors. He agreed he did not have background information on these potential jurors. Counsel assumed he objected to the "rounded up" jurors but said he did not have independent recollection of his objection. Counsel said that at the time of the post-conviction hearing, he was unaware of the statutory requirements for empaneling a jury when a venire did not contain sufficient potential jurors and that he could not recall if he knew the statutory procedure at the time of the trial. He could not recall the number of jurors "selected off the street."

Trial counsel testified that he recalled that at one point during the trial, a bench conference was held during which the trial court told the prosecutor that "Denise has been hearing comments, whispered comments from those people back there and they're sitting right beside the jurors." The court told the prosecutor to instruct "Caroline to tell them I don't want to hear anything or see them making any remarks, period." The prosecutor replied that she had admonished them previously but would again. Although trial counsel recalled the incident, he did not recall whether he requested the trial court question the jurors about what they might have heard. He said that he did not recall the victim's family "crying and carrying on" during the trial but said it would have been important to discover what the jurors might have heard.

Trial counsel testified that the photographs of the victim received as exhibits at the trial were gruesome, that he filed a motion to exclude them, and that the trial court excluded some of the photographs.

Trial counsel testified that the incident in this case began with a vehicle collision and that he did not know what happened to the victim's car. Counsel said that the victim was placed inside a vehicle when the victim was on the mountain and that several men drove the victim down the mountain to the Petitioner's parents' home. He said that the victim's car might have possessed exculpatory evidence in relation to any damage sustained during the collision. Counsel agreed any damage to the victim's car might have explained some of the victim's injuries. Counsel said he did not think it was important to view any of the vehicles involved. He could not recall whether any of the photographs of the vehicles involved showed raised hoods but thought there were photographs of the undercarriage of the vehicles. Counsel did not visit any of the crime scenes and said that testimony of the witnesses who were at the scene and the autopsy results rendered testimony about the automobile collision unimportant. Counsel did not recall testimony about the impact of the collision on the victim before the victim was pulled from his car. Although photographs of the interior of the victim's car were obtained, counsel did not investigate whether damage was sustained to the dash of the victim's car. Counsel agreed he had no training in accident reconstruction.

Trial counsel testified that he did not hire a private pathologist to review the medical examiner's findings and conclusions. Counsel noted that his motions for funds for an expert witness was denied. He said that he did not hire any investigators and that the defense did not present proof at the trial. Relative to discovery, counsel said he reviewed the prosecutor's file, made a copy of the court file, met with the prosecutor twice, met with a codefendant's attorney, interviewed Detective James Burris, reviewed witness statements, prepared motions, met with witnesses, reviewed a video recording and photographs, reviewed the preliminary hearing transcripts, and reviewed the previous defense attorney's file. Counsel recalled interviewing Brad Stamey, the Petitioner's parents, and "some of those older guys" inside the vehicle. Counsel recalled no surprise witness testimony at the trial.

Trial counsel testified that before the trial, he and the Petitioner met for 8.3 hours and noted that he did not always note all of his hours. Counsel agreed that the Petitioner's case was his first murder trial. He said that he had previously represented a client charged with capital murder and that the parties reached a plea agreement for reckless homicide after opening statements. Counsel did not recall the jurors' having inadvertently seen the Defendant in shackles.

Trial counsel testified that he thought he filed a motion for the State to disclose any plea agreements it reached with other people involved in the incident but said that his case

file did not contain any motion. Counsel agreed that a toxicology report of the Petitioner's blood was included in the State's discovery materials and that he did not recall presenting the report at the trial. Counsel recalled testimony relative to who was intoxicated at the time of the incident. Relative to a microanalysis of "some tail lights," he did not recall using the report at the trial and said the trial transcript reflected the proof. Counsel thought he interviewed someone with the last name Payne, a witness who was inside the car at the time of the incident. He recalled that the older male witnesses had conflicting statements and various disabilities.

Trial counsel testified that he filed a motion for a change of venue, that he recalled a short hearing on the motion, and that he was unsure whether an offer of proof was made at the hearing. He said he filed a pretrial motion to prohibit the State's witnesses from mentioning the Petitioner's additional criminal charges and recalled Joe Price's testifying at the trial that the Petitioner was taken into police custody at the time of the incident because the Petitioner had outstanding warrants for his arrest. Counsel agreed the transcript reflected Mr. Price testified that the Petitioner was placed in police custody for some outstanding warrants and said counsel objected to the testimony.

Trial counsel testified after reviewing the trial court file that the file reflected counsel filed motions related to venue and a new trial and noted that the file showed the Petitioner's previous counsel filed the motion for a change of venue. Although counsel agreed his motion to restrict the State's witnesses from mentioning the Petitioner's additional criminal charges was not contained in the court file, he recalled discussing it during a court appearance.

Trial counsel testified that he did not obtain photographs of the victim's car. After reviewing the trial transcript, counsel agreed Mr. Stamey testified that the Defendant "roughed . . . up" the victim, although the prosecutor stated during her closing argument that the Defendant "kept stomping the victim at the house because he wanted him dead." After reviewing Mr. Stamey's testimony, counsel agreed that Mr. Stamey testified at the trial that he arrived on the mountain sometime after lunch, although he was unsure of the time. Counsel, likewise, agreed Mr. Stamey testified at the preliminary hearing that he arrived on the mountain around 8:00 a.m. Counsel could not explain why he did not impeach Mr. Stamey at the trial regarding his inconsistent statement and said post-conviction counsel was asking counsel to play "Monday morning quarterback" years after the trial. Trial counsel agreed Mr. Stamey testified at the trial that the Petitioner arrived on the mountain around 2:00 or 3:00 p.m. but testified at the preliminary hearing that "everybody . . . met up there" around 6:00 p.m. Counsel could not explain why he did not mention the inconsistency during cross-examination. Counsel agreed Mr. Stamey provided multiple inconsistent statements.

Trial counsel testified after reviewing the transcript that Donald Payne had testified at the trial that the Petitioner began beating the victim with his fist and that the Petitioner struck the victim ten to twenty times with his fist. Counsel agreed, though, that Mr. Payne's statement to the Tennessee Bureau of Investigation (TBI) reflected that the Petitioner dragged the victim out of the car by the victim's head and ears, that the Petitioner attempted to pull the victim by his hair, that the Petitioner hit the victim in the throat with his fist, that the victim fell on the ground, that the Petitioner kicked the victim in the head and stomped the victim in the chest, and that the Petitioner picked up the victim and slammed the victim's head into the car's bumper. Counsel agreed that Mr. Payne testified that "they" brought the victim back the day after the incident and that the victim was deceased. Counsel also agreed that in his pretrial statement, Mr. Payne said the Defendant, "the girl," Mr. Stamey, and the victim, who was in the back seat of the car, returned to the mountain about thirty-five to forty minutes later, that the victim was naked, that "we" got the victim out of the car and attempted to help the victim, and that the victim had no pulse or heartbeat. Counsel agreed the statements were inconsistent.

Trial counsel testified that Mr. Stamey denied at the trial that he witnessed the victim's head strike a car's bumper but that Mr. Stamey told the TBI that the Petitioner pulled the victim from the car, struck the victim with his fists, knocked down the victim, grabbed the victim by his hair and dragged the victim on the payment, and rammed the victim's head into the car's bumper. Counsel agreed the statements were inconsistent. Counsel stated relative to each inconsistent statement that although he did not recall noticing each statement during the trial, counsel highlighted several inconsistencies during the wintesses's cross-examinations.

Trial counsel testified that he was appointed to the Petitioner's case on November 8, 2004. He said that he initially met with the Petitioner on the day counsel was appointed, although his fee claim did not reflect any meeting until May 9, 2005. He agreed that on a May 9 court appearance, a November 15 trial date was scheduled. He agreed his fee claim did not reflect work between May 9 and November 3. Counsel agreed his fee claim only noted his interviewing one witness and Detective Burris. He could not recall which witness interview was referenced in the fee claim. He said regardless of what the fee claim reflected, he interviewed everyone who witnessed the incident. He said that although all the witnesses appeared to have been intoxicated and provided contradictory statements, all the witnesses consistently stated that they saw the Petitioner strike the victim. Counsel said he believed he interviewed TBI Agent David Guy before the trial.

Trial counsel testified that the trial occurred nine years before his post-conviction testimony. He agreed the trial transcript reflected that the victim's shoes were introduced at the trial and that counsel objected because he had not seen the shoes. He recalled going to

-13-

the sheriff's office to speak with Detective Burris and thought the detective showed him the physical evidence but was uncertain. Counsel agreed the trial transcript reflected that during an in-chambers conference, he requested and was denied a continuance in order to file a motion for a medical expert to review the autopsy report. He agreed the motion was argued outside the court reporter's presence.

Trial counsel testified that although the fee claim reflected only one meeting with the Petitioner before the trial, counsel knew he met with the Petitioner at least twice. Counsel thought two meetings were sufficient given the facts of the case. Counsel noted discussing with the Petitioner the strategy of focusing on the lesser included offense of reckless homicide and said he told the Petitioner that the proof would likely "fall[] one way or the other." Counsel believed he and the Petitioner discussed whether an expert was needed but was uncertain.

Trial counsel testified that although a police summary report noted that the Petitioner stated the victim was injured during an automobile collision, counsel did not recall discussing with the Petitioner whether the collision caused the victim's injuries. Counsel noted, though, that the collision was mentioned when he and the Petitioner met to prepare for the trial. Counsel recalled Mr. Stamey's testifying at the trial that the victim's car was steaming and that one vehicle's muffler dragged the ground. Counsel vaguely recalled Mr. Stamey's testifying that the victim's car was not going to make it to the victim's daughter's home.

After reviewing the trial transcript, trial counsel testified that the State presented TBI Agent Guy as an accident reconstructionist and that the transcript did not show counsel objected. Counsel said he did not know before the trial that Agent Guy would testify about his experience and training as an accident reconstructionist. Counsel said he thought Agent Guy would testify about the "photographs of the tail light underneath the car." Counsel said he and the Petitioner did not discuss hiring an accident reconstructionist. Counsel agreed he thought Agent Guy attempted to indicate that the Petitioner had lied about the automobile collision when Agent Guy testified that the car showed old damage and that the victim's car had not been involved in a frontal crash. Counsel agreed he could not cross-examine Agent Guy relative to his conclusions. Counsel agreed he did not question Agent Guy before or during the trial about his qualifications as an accident reconstructionist.

Trial counsel testified that he did not recall any testimony at the trial regarding whether the victim wore a seatbelt or whether the dash or the windshield of the victim's car sustained any damage during the automobile collision. Although counsel conceded he was not an expert in pathology, he concluded from the witness testimony that the victim's injuries were not sustained as a result of a collision. Counsel noted that he could read an autopsy report and review photographs and that the "hurdle" for the defense was the extent of the

victim's neck and head injuries. Counsel agreed, though, it would have been important to determine whether the injuries could have been caused from an automobile collision. He agreed the medical examiner testified at the trial that the victim's neck injuries could have occurred at the same time, that only the hyoid bone was fractured, and that the fracture could have been caused by strangulation or blunt force trauma, which included an automobile collision. He could not recall whether he interviewed the medical examiner before the trial and said he saw "some significance" of consulting an accident reconstructionist.

Upon questioning by the post-conviction court, trial counsel testified relative to meeting in the district attorney's office that he recalled one meeting with the prosecutor about ten days before the trial but could not definitively say it was the only meeting. Counsel noted he and the prosecutor talked in court and when they saw each other outside of court. Counsel said that his trial strategy was to mitigate the Petitioner's intent, that counsel's focus was on the Petitioner's culpability, and that he hoped to establish the Petitioner's conduct was reckless. Counsel said that although he did not recall considering other strategies, focusing on culpability was the chosen strategy after speaking with the Petitioner.

Trial counsel testified that he objected when Detective Price mentioned the Petitioner's outstanding warrants at the trial and that the trial court overruled the objection but told the prosecutor not to mention the warrants again. Counsel said mentioning the warrants was prejudicial relative to the Petitioner's propensity to commit the crime for which he was charged. Counsel noted that the trial transcript showed he asked for a curative instruction but that the trial court did not provide it. Counsel did not recall requesting a mistrial and said that if the transcript did not reflect a motion, he did not know why he did not request a mistrial.

Trial counsel testified that the evidence showed that after the automobile collision, a physical altercation occurred and that after the fight, the Petitioner said he was going to kill the victim. Counsel agreed that the Petitioner's next contact with the victim was at the Petitioner's parents' home. After reviewing the transcript of the prosecutor's closing argument, counsel agreed the prosecutor stated a second fight occurred at the Petitioner's parents' home.

Trial counsel identified a November 10, 2005 letter from the prosecutor containing a plea offer for twenty-five years' confinement in exchange for the Petitioner's pleading guilty to second degree murder and for concurrent service with all of the Petitioner's pending charges. The letter stated that the offer was effective until November 14, 2005, the day before the trial began. Counsel testified that although he could not recall whether he showed the letter to the Petitioner, counsel and the Petitioner discussed the offer. Counsel said they probably discussed the letter during one of their long meetings. Counsel could not recall

whether he had the Petitioner sign any documentation confirming whether the Petitioner accepted or rejected the offer. Counsel said that his general practice was to have a client sign documentation relative to a plea offer, that he thought he attempted to have the Petitioner sign documentation, and that the Petitioner refused. Counsel said, though, he could not definitively remember if he followed his usual practice in this case. Counsel recalled that the Petitioner did not like the offer and that the Petitioner said, "This is nothing more than a reckless type deal." Counsel said the Petitioner wanted counsel to negotiate a reckless homicide plea agreement because the Petitioner did not intend to kill the victim and did not think he hurt the victim enough to cause the victim's death.

On cross-examination, trial counsel identified a November 8, 2005 facsimile record sent to the prosecutor's office, which included a motion in limine to exclude mentioning the Defendant's statement as a confession, to exclude portions of the Defendant's statement that were not relevant to the incident, to require the trial court to rule upon the voluntariness of the Defendant's statement before it could be used to impeach the Defendant's trial testimony, to exclude mentioning the Defendant's failure to deny accusations without showing the Defendant knew he was being accused of wrongdoing, and to prohibit commenting on the Defendant's invoking his right to remain silent, receiving his *Miranda* warnings, and declining to consent to a search or to perform any tests. The facsimile also included a motion to restrict photographs of the victim and the crime scene, a motion for exculpatory evidence, a motion for a pretrial ruling regarding the Defendant's previous convictions, a motion to restrict publicity, and a motion to require to the State to reveal any agreements entered with its witnesses, including an unknown drug task force informant. Counsel did not recall whether he filed the motions with the trial court clerk's office. Counsel stated after reviewing the trial transcript that he renewed previous counsel's motion for a change of venue. Counsel said that previous counsel filed the motion but that after jury selection, trial counsel renewed the motion because counsel feared the court had never addressed it. Counsel recalled the trial court's denying the motion.

Trial counsel testified that witnesses discussed two distinct incidents in which the Defendant "beat[]" the victim and that none of the witnesses described the victim sustaining injuries during an automobile collision. Counsel said that he was sure he and the Petitioner reviewed the autopsy report and that counsel highlighted the damaging information it contained. Counsel recalled seeking advice from other attorneys regarding trial strategy and receiving negative feedback because of the unfavorable facts. Counsel said that he and the Petitioner discussed the plea offer and that he attempted to show the Petitioner "it just didn't look good." Counsel recalled that the Petitioner did not request an ambulance or call for assistance and made poor decisions, many of which were used to infer premeditation. He agreed witnesses heard the Petitioner say, "I'm gonna kill that S.O.B.," and "Somebody's gonna pay for this." Counsel recalled testimony that Mr. Stamey begged the Petitioner to

leave the victim alone because the victim had endured enough, that the Petitioner said, "No, the son of a b---- hadn't had enough," and that the Petitioner continued kicking and stomping the victim. Counsel stated that the theory an automobile collision caused the victim's injuries "defied logic" based upon the brutal beating witnessed by numerous people.

Trial counsel testified that he and the Petitioner discussed the Petitioner's testifying at the trial and that the Petitioner appeared to understand their discussion. Counsel said that although he probably recommended the Petitioner accept the plea offer, the decision belonged to the Petitioner.

After reviewing the trial transcript, trial counsel testified that Mr. Stamey acknowledged speaking to counsel about the case before the trial. Counsel did not recall his cross-examination strategy for Dr. McMaster but remembered Detective Burris, who had known the victim since childhood, did not recognize the victim at the scene. Counsel recalled that the photographs were "brutal" and said that based upon the photographs and the witness statements, he did not think the evidence supported the argument that the victim's injuries were caused by an automobile collision.

After reviewing the trial transcript, trial counsel testified that Agent Guy stated on cross-examination that it was possible the victim's car struck the Petitioner's car, damaging both vehicles. Counsel agreed that Agent Guy's testimony allowed counsel to argue an automobile collision occurred. Counsel recalled, though, that one of the cars was parked at the Petitioner's parents' home and that the taillight pieces were lying on the ground under the bumper.

On redirect examination, trial counsel testified that he could not say definitively the motions in the facsimile were all of the motions he filed in the Petitioner's case. He said he did not always obtain a filed stamped copy of the motions he submitted to the trial court. He did not recall any orders related to his pretrial motions. Counsel said that he recalled portions of the motions being argued before the court. He recalled the court's granting in part his motion to exclude photographs and the court's denying his motion on publicity.

Michael Acuff, an expert in criminal law, testified that he had reviewed the Petitioner's case, except the trial court's technical record. Relative to the fee claim, Mr. Acuff was surprised by the six hours of work detailed for the first year and by counsel's failure to hire an investigator to speak with the witnesses to prevent counsel's becoming a witness for the defense. Mr. Acuff said that in a first degree murder case, he hired investigators within the first month of his representation.

Mr. Acuff testified that he would have considered hiring experts and noted that the Petitioner's statement that the Petitioner thought the victim's injuries were consistent with an automobile collision, rather than an assault. Mr. Acuff said he would have determined whether this was a viable theory of the case by speaking with experts, including a pathologist and an accident reconstructionist. He said he would not rely on lay witnesses's accounts to determine whether the cause of the victim's injuries was an assault or automobile collision. Mr. Acuff said that it appeared trial counsel did not work on the Petitioner's case for the first year of his representation and that counsel attempted to put on "a full court press" ten days before the trial. Mr. Acuff said it was not feasible to prepare for a trial in this case within ten days.

Mr. Acuff testified that he or his investigator interviewed each witness named in the indictment because "[y]ou never know what might be there." He said that probably "nothing was to be found" at the scene in this case but that typically, the "standard of care" required a visit to the scene. Mr. Acuff said that he always interviewed the pathologist and noted that the victim sustained multiple injuries and that no single injury caused the victim's death. Mr. Acuff said that determining whether one of the significant injuries could have resulted from an automobile collision was important.

Mr. Acuff testified that Agent Guy's testimony at the trial as an accident reconstructionist could have been offered to negate any assertion that an automobile collision occurred before the Petitioner assaulted the victim. Mr. Acuff thought that trial counsel should have questioned the witnesses regarding the collision.

Mr. Acuff testified relative to the jury selection that he was "struck" by trial counsel's not objecting to bringing in additional potential jurors from outside the courtroom. Mr. Acuff believed that the voir dire questioning was not as extensive as it needed to have been to ensure jurors did not have personal relationships with any of the parties. He noted that to obtain information beyond the "sheet" providing some personal information about each potential juror, counsel had to submit a questionnaire.

Mr. Acuff testified that he could not conclude that trial counsel was "incorrect" by not requesting a mistrial after Detective Burris testified that the Petitioner had outstanding arrest warrants. Mr. Acuff noted counsel was placed in a difficult situation as a result of the detective's statement.

Mr. Acuff testified that he would have inspected the Petitioner's and the victim's cars if possible and that he would have viewed the physical evidence maintained by the sheriff's office. He said that those tasks might have appeared perfunctory but that they were necessary. He said that although viewing the physical evidence could have been done at any

time, viewing the evidence as early as possible was important. He said that any information learned during the inspection could have been used at the trial but that viewing evidence too late prevented its use at the trial.

Mr. Acuff testified relative to the plea offer that he would have discussed the offer with his client and provided his client with as much information as possible. He said that because trial counsel did not receive the email containing the plea offer until after business hours on November 10 and because the records reflected counsel and the Petitioner met on November 13, Mr. Acuff believed counsel and the Petitioner first discussed the offer on November 13, two days before the trial began.

Mr. Acuff testified that he was familiar with the American Bar Association's Defense Function General Standards (Standards) and said the Standards included counsel's engaging in a prompt investigation and interviewing clients as soon as practical. He said that an attorney was required to investigate even when the line of investigation proved fruitless. He stated that in his opinion, the largest deficit in the Petitioner's case was a lack of promptness. Mr. Acuff noted that the Petitioner underwent an analysis of his blood to determine the alcohol content but that the report was missing from all the files Mr. Acuff reviewed. He said that nothing reflected trial counsel attempted to locate the report or to obtain a remedy for its loss. Mr. Acuff noted that intoxication was significant and relevant to the Petitioner's intent.

Mr. Acuff testified that meeting twice with a client in a case similar to the Petitioner's was insufficient and that he or his investigator took notes when meeting with the client or witnesses. Mr. Acuff noted that the Standards discussed establishing a relationship with a client and said having a relationship with a client was helpful to the flow of information.

Mr. Acuff testified that the motion for continuance in an effort to obtain expert services was argued in chambers outside the Petitioner's presence and that similar motions were almost always argued *ex parte* well before the trial. Mr. Acuff said that trial counsel "was put in position" to make his request for expert services known to the prosecution because he did not file his request earlier. Mr. Acuff stated that impeaching witnesses with inconsistent statements required preparation before the trial. He said that one witness stated at the trial that the Petitioner assaulted the victim for forty-five minutes and other witnesses stated the assault occurred for five minutes, that the medical examiner testified at the trial that the victim had no broken bones or skull fractures, and that common sense dictated trial counsel's questioning the medical examiner about whether a forty-five-minute beating was consistent with her findings. Mr. Acuff noted that because no single injury was identified as the cause of death, a defense expert could have provided another view of the cause of death and could have determined whether the injuries were sustained from an assault.

On cross-examination, Mr. Acuff testified that he could not discount a theory that the victim's injuries were caused by an automobile collision. He said that the evidence showed a short time elapsed between the automobile collision and the assault and that no investigation was performed regarding whether the victim had injuries before the assault. Mr. Acuff said many unanswered questions existed in this case relative to the injuries.

Mr. Acuff testified that if he would have been the Petitioner's trial counsel, the Petitioner probably would not have testified at the trial because of the Petitioner's history of violence. He agreed the Petitioner told the police that the victim fell out of the car but that witnesses said the Petitioner dragged the victim out of the car. Mr. Acuff noted, though, that the witnesses had consumed alcohol and had varying degrees of intoxication, which could have been used to impeach the veracity of their observations and the credibility of their statements. He agreed that none of the witnesses told the police that the victim was injured as a result of the automobile accident and that all of the vehicles were driven from the scene.

Mr. Acuff testified that he had no "quarrel" with trial counsel for not requesting a mistrial when the Petitioner's outstanding warrants were mentioned. Mr. Acuff did not question whether trial counsel received all of the discovery but questioned when counsel received it. Mr. Acuff said that his trial strategy would have been to negate the Petitioner's intent by focusing on the Petitioner's intoxication level. Mr. Acuff said that timing was also an issue because he believed the victim might have been deceased before being taken up the mountain, which was relevant to the kidnapping-related felony murder charge. Likewise, he said he would have focused on the inconsistencies between the witness statements to show lack of credibility. Last, he said he would have challenged the State's position that no automobile collision occurred or that the collision was minor.

On redirect examination, Mr. Acuff identified a search warrant to obtain the Petitioner's blood for determining his alcohol concentration level and noted the report was not included in the materials he reviewed. He said that because the report was lost, the Petitioner would have been entitled to a special jury instruction regarding the loss of the evidence. The post-conviction court noted that the warrant was dated July 25, 2002, which was five days after the incident and that the jury was instructed relative to the intoxication defense. On recross-examination, Mr. Acuff testified that trial counsel made no attempt to ascertain the condition of the interior of the vehicles involved in the collision.

The Petitioner testified that he first met with trial counsel in November 2004 and that they spoke for about twenty minutes inside the courtroom. He said that after their in-court meeting, he was sent to Riverbend prison where he remained until five days before the trial. He said that he and counsel met again at the beginning of 2005 when a status hearing was

-20-

scheduled, that they spoke for about one hour, and that they met once more at the Polk County Jail for about one and one-half hours.

The Petitioner testified that he wrote letters to trial counsel requesting information about the status of his case and asking counsel to retain expert witnesses but that counsel did not respond. The Petitioner said that he was never provided the State's discovery package and that counsel stated he had not yet received the discovery materials. He said he saw Samantha Bivens's statement for the first time at the post-conviction hearing. He recalled reviewing Kenneth Stamey's, Brad Stamey's, and Donnie Payne's statements at a status hearing in mid-2005. He said later, though, that he received the discovery materials after the trial concluded but that he did not know if what he received was all of the discovery.

The Petitioner testified that he requested trial counsel retain an expert relative to the automobile collision because it was "horrendous" and because the victim's car was inoperable. The Petitioner said that because the medical examiner concluded that the victim's cause of death was blunt force trauma, the Petitioner wanted counsel to consult another pathologist to consider whether the collision could have been the source of the blunt force trauma. The Petitioner said that when he attempted to discuss experts with counsel at the status hearing, counsel said he would "look into it" but that when they met just before the trial, counsel said he did not have any experts.

The Petitioner testified that after the trial, he received copies of the motions trial counsel sent to the prosecutor by facsimile. The Petitioner said counsel never discussed his theory of the case, trial strategy, or whether counsel interviewed Brad Stamey, Hazel Stamey, and Donnie Payne. The Petitioner said that when he asked counsel about interviewing these witnesses, counsel reported having difficulty locating them. The Petitioner said that counsel did not review the indictment with him. He said counsel did not show him the TBI crime scene evidence log, the photographs of the scene, or the photographs of the cars until the first day of the trial.

The Petitioner testified that he requested trial counsel inspect the Petitioner's and the victim's cars, that counsel never responded to his requests, that the Petitioner's parents took photographs of the Petitioner's car, that the photographs were provided to counsel, and that the Petitioner did not know what counsel did with the photographs. The Petitioner said the photographs were not introduced at the trial. The Petitioner said that he and counsel never discussed the State's evidence relative to the tampering with evidence charge and that he did not know Agent Guy would testify as an accident reconstructionist. The Petitioner said he had never seen the video recording of the crime scene and denied he and counsel reviewed it together.

The Petitioner testified that he did not see a November 10, 2015 letter regarding the twenty-five-year plea offer until he received the State's discovery package after the trial. The Petitioner denied that he and counsel discussed any plea offer before the day his trial began. He said that on the morning his trial began, counsel and the prosecutor had a discussion in the trial judge's chambers and that counsel returned to the courtroom fifteen minutes before the trial began and informed him the State was offering twenty years' confinement. The Petitioner said he rejected the offer.

The Petitioner testified that he and counsel discussed the autopsy report the week of his trial and that counsel was "mesmerized" by the extent of the victim's injuries. The Petitioner said that although counsel never mentioned the medical examiner's testifying or speaking with counsel before the trial, counsel told the Petitioner that counsel had spoken with counsel's mother about the victim's injuries. The Petitioner said counsel's mother had a nursing background.

On cross-examination, the Petitioner testified that he told the investigating officer that the victim was injured in an automobile collision. He identified his handwritten statement to the police and agreed the statement did not mention a collision. The Petitioner said, though, that although the signature was his, the statement was not.

The Petitioner testified that trial counsel argued a motion to exclude photographs on the day of the trial and thought that a motion to change venue was addressed. The Petitioner said he did not have proof showing he sent any letters to counsel. The Petitioner said he and counsel did not discuss the Petitioner's right to testify at the trial, but he admitted counsel advised him against testifying because of his previous convictions. The Petitioner admitted he agreed with counsel's advice.

The deposition of James Norris II was received as an exhibit. The record reflects that the defense tendered Mr. Norris as an expert in accident reconstruction and civil engineering without objection from the State. Mr. Norris testified that he had reviewed a letter from the Petitioner detailing his version of the events, expert testimony from TBI Agents Guy and Betts, and exhibits related to the agents' testimony. Mr. Norris said that Agent Guy's knowledge of accident reconstruction appeared to be the product of a generalized law enforcement course, typically lasting two to three weeks, and an annual refresher course. Mr. Norris believed the law enforcement course provided a basic understanding of accident reconstruction but failed to provide an understanding of the physics and mathematical components.

Mr. Norris testified that although Agent Guy concluded that the broken taillights below the victim's car parked outside the Petitioner's parents' home indicated the damage

was sustained where the car was parked, Mr. Norris concluded the evidence was inconclusive. Mr. Norris said that in many cases, a vehicle might sustain damage at one location but debris fall from the vehicle after it was moved to another location. In reviewing photographs of the victim's car presented during the trial, Mr. Norris noted that the car sustained "heavy damage, crinkling of the hood, as well as the bumper and kind of radiator cover area being smashed in." Mr. Norris disagreed with Agent Guy's testimony that the photograph showed old and new damage to the victim's car and that some of the damage was old because car parts were not lying on the ground. Mr. Norris stated that parts of damaged vehicles could fall off immediately at the crash site but that parts did not always fall off immediately or at all. Mr. Norris said the only true method to determine whether damage was old or new was to compare photographs of a vehicle before and after an incident. He said, though, damage would have been old if broken parts showed rust or paint wear at the time of the incident.

Relative to the photographs of the Petitioner's car admitted at the trial, Mr. Norris testified that the images were too far away in order for him to observe any damage. However, he stated that had he been able to examine the car, he would have looked under the rear bumper. He noted that bumpers contained a honeycomb- or matrix-style structure that broke or deformed upon impact without showing external damage. He said he would have examined the area of the collision for evidence of an impact, tire markings, and gouge and scrape marks. He said that the most common evidence of a collision was some type of tire markings and that many times parts of a vehicle might be forced downward to the ground through impact causing scrape or gouge marks. Mr. Norris believed that some type of tire markings would have resulted from the collision based upon the age of the victim's and the Petitioner's cars. He said that had he been able to examine the cars, he would have taken crush damage measurements of the respective bumpers to obtain the depth of the damage and the locations of the impact, which would have allowed a determination of how the vehicles impacted. He said that various analytical techniques could have determined the force and energy applied during the collision and the impact speed. Mr. Norris said he would have also wanted to examine the light filaments of the taillights on the Petitioner's car and the headlights on the victim's car because filaments stretched or deformed when force was applied. Based upon the witness testimony at the trial and the Petitioner's statement to Mr. Norris that the Petitioner applied the brakes before the victim rear-ended the Petitioner's car, Mr. Norris would have examined the taillights of the Petitioner's car to determine if the brakes lights were on at the time of the impact in an effort to corroborate the information.

Mr. Norris testified that in his opinion, it was improbable that the photographs admitted at the trial allowed for determining whether a person used the person's hand to damage the car. Mr. Norris noted the crumpled hood was consistent with an "impact of some sort."

Mr. Norris testified that he would have examined the cars' frames to determine if any damage was sustained by any impact and that he would have examined the cars' interiors to determine seat belt usage, whether airbags deployed, and whether any body parts struck any objects inside the car. Mr. Norris said that although Agents Guy and Betts documented blood stains and forensic evidence inside the victim's car, the records he reviewed did not reflect whether they examined the car to determine whether the victim's body struck any objects inside the car, such as the dash or steering wheel. Mr. Norris said that the testimony regarding the steam coming from the victim's car and "going down to . . . two cylinders" was indicative of damage from a crash but that he was unable to "draw a hardline conclusion" because there could have been a preexisting mechanical condition. He said, though, that radiator damage, which caused leaking coolant, overheating, and steam, would have been related to the collision. He said that examining the engine compartment under the hood would have been an easy method of determining crash damage and that a mechanical engineer would have been required to determine whether the engines' cylinders were damaged in a collision.

On cross-examination, Mr. Norris testified that accident reconstruction also entailed examining perception and reaction, how a driver perceived a hazard, how a driver reacted, and whether the reaction was appropriate. He said that eye witnesses to a collision were not included in the human factors portion of accident reconstruction because the focus was on the drivers of the vehicles involved. He said, though, that statements of passengers were always considered important but that collisions occurred quickly and memories were not always crisp.

Mr. Norris provided the Petitioner's letter to Mr. Norris detailing the Petitioner's version of events and testified that although he considered the Petitioner's letter, science and physical evidence overruled any witness account. He said that the photographs he previously discussed were taken at the Petitioner's parents' home. He said that typically gouge marks indicated a significant impact but that the marks could indicate a deseated or deflated tire.

Mr. Norris testified that he had not reviewed the witness statements. He was provided Ms. Bivens's first police statement in which she stated she attempted to help the victim, became angry, and kicked out the headlights and taillights on the victim's car. Mr. Norris agreed that Ms. Bivens's statement indicated damage not caused by a collision. Mr. Norris was also provided Ms. Bivens's second statement to the police in which she detailed the Petitioner's "bumping" the victim's car and getting the victim to stop his car, the Petitioner's opening the victim's car door and pulling out the victim by his head, the Petitioner's striking the victim in the throat, the Petitioner's kicking and stomping the victim, the Petitioner's being warned he was going to kill the victim if the Petitioner did not stop the assault, the Petitioner's stating he intended to kill the "son of a b----," and the Petitioner's running the

victim's head into the car bumper. Mr. Norris also reviewed Donald Payne's police statement, which was consistent with Ms. Bivens's second police statement. Mr. Norris said that the statements indicated the cars collided and that it was possible the collision was the result of road rage.

Mr. Norris reviewed the Petitioner's police statement, in which the Petitioner stated that the Petitioner "finally got [the victim] stopped, that the victim opened the car door and fell onto the roadway, that the Petitioner was angry and began kicking the victim, that the Petitioner's father arrived and told the Petitioner to stop the assault, and that the Petitioner complied. Mr. Norris said that the statements did not provide enough information to conclude whether the collision was minor or serious.

Mr. Norris reviewed Ken Stamey's police statement in which Mr. Stamey stated that the Petitioner and the victim were driving side-by-side, that the Petitioner was driving on the wrong side of the road, that the Petitioner swerved his car into the victim's car, that the Petitioner finally drove his car around the victim's car, that the Petitioner "blocked" the victim's car, and that the victim stopped his car.

Mr. Norris reviewed the autopsy report and noted the victim's extensive injuries. When asked whether his review of the collision would support the significant injuries noted in the autopsy report, Mr. Norris said that he had not reviewed the evidence in that vein and that such a determination was appropriate for someone with medical expertise. He said that had an accident reconstruction expert been involved in the Petitioner's case, the expert may have been able to corroborate or disprove the witnesses's statements.

The post-conviction court denied post-conviction relief. The court noted that the Petitioner sought post-conviction relief on numerous grounds, some of which included issues not involving the abridgment of a constitutional right. The court summarily dismissed the Petitioner's non-constitutional claims for failure to state a colorable claim.

Relative to the Petitioner's claims regarding empaneling the grand and petit juries, the trial court's jurisdiction, the sentencing laws applied to the Petitioner upon conviction, and the State's withholding exculpatory evidence and violating *Brady*, the post-conviction court found that the Petitioner failed to present clear and convincing evidence supporting his claims and denied relief on these grounds.

Relative to the Petitioner's claim that he received the ineffective assistance of counsel, the post-conviction credited trial counsel's testimony but noted counsel was handicapped by memory limitations. The court credited Mr. Acuff's expert testimony and noted Mr. Acuff provided a wealth of information about criminal defense practice. The court found, though,

that Mr. Acuff's testimony was limited because of no contemporaneous involvement in the Petitioner's case and that Mr. Acuff's knowledge of the present case was limited to a retrospective analysis of the evidence. The court noted Mr. Acuff was afforded the benefit of collaborating with post-conviction counsel. The court credited Mr. Norris's expert testimony about the complexities of accident reconstruction and Mr. Norris's skepticism about the conclusions drawn by the State's trial witnesses. The court found, though, that Mr. Norris's conclusions were limited by Mr. Norris's minimal knowledge of the facts of the case. The court found that Mr. Norris did not draw conclusions contrary to the State's witnesses but merely questioned the methodology used by those witnesses, questioned trial counsel's opinions, and explained what Mr. Norris would have done to investigate the automobile collision. The court found that Mr. Norris provided little substantive opinion that would have contradicted the State's witnesses.

The post-conviction court found that the Petitioner's testimony at the evidentiary hearing was "limited by his appearance and demeanor and obvious motivation and interest" to testify in a manner that "bolstered" his post-conviction claims. The court found that all disputes and conflicts in the testimony were resolved against the Petitioner because "of his obvious bias."

The post-conviction court found that although trial counsel was inexperienced in trying homicide-related cases, counsel's performance was not deficient in many respects. The court found that counsel effectively represented the Petitioner by negotiating a plea offer of twenty-five years to second degree murder, which would have been served concurrently with all of the Petitioner's pending charges. The court noted the Petitioner rejected the twenty-five-year offer and later rejected a twenty-year offer on the first day of the trial.

The post-conviction court found that trial counsel presented an effective mitigation defense at the trial in an effort to show the Petitioner did not act with premeditation. The court noted the overwhelming evidence against the Petitioner and stated it would not question counsel's strategic decision to focus on mental culpability. The court found that counsel effectively impeached the State's witnesses with their pretrial statements and noted that the witnesses' trial testimony was significantly less incriminating than the contents of their pretrial statements. The court found that counsel effectively limited the number of photographs depicting the victim's injuries at the trial. The court found that given the overwhelming proof of the Petitioner's guilt at the trial, counsel's performance exceeded the professional standards in these matters.

However, the post-conviction court found trial counsel's performance deficient in multiple aspects. The court found that counsel's fee claim showed minimal pretrial investigation and preparation for the trial. Although the court credited counsel's testimony

that he did not always submit in a fee claim all of the hours he worked on a case, the court found that counsel could not state with any certainty that he spent time on the Petitioner's case in excess of the hours submitted in the fee claim.

The post-conviction court found that although trial counsel drafted pretrial motions, no evidence showed trial counsel filed them with the trial court or obtained rulings from the trial judge. The post-conviction court stated that the transcript of the trial court proceedings showed that some pretrial issues might have been discussed in chambers and in the court reporter's absence. The court found that counsel's performance in this regard was deficient because counsel had a duty to litigate all matters properly and to preserve the Petitioner's rights for an appeal.

The post-conviction court found that the trial court had difficulty empaneling a petit jury and that the trial court did not request the court clerk to procure the attendance of additional randomly selected and qualified jurors from the venire for the court term. The court found that the trial judge instructed "prospective jurors to be literally plucked from the streets" outside the courthouse. The post-conviction court found trial counsel did not object or question the trial judge's procedure and that counsel testified at the evidentiary hearing that he was unaware of the empaneling process contained in Tennessee Code Annotated section 22-2-310, that he did not think he needed to object, and that he did not discuss the empaneling process with the Petitioner. The court found counsel's performance deficient relative to these matters.

The post-conviction court found that although Detective Joe Price testified in violation of a pretrial ruling relative to the Petitioner's being detained because of outstanding arrest warrants, a bench conference was held and that the State's witnesses were admonished not to discuss the Petitioner's previous criminal convictions or outstanding warrants. The court found that the testimony of trial counsel and the Petitioner reflected that counsel and the Petitioner did not discuss whether to request a mistrial and that counsel did not consider the prospect of obtaining any remedy. The court noted that counsel failed to preserve the issue for plenary review when he failed to include it in the motion for a new trial. The court acknowledged this court found on appeal that plain error relief was not warranted. The court found counsel's performance deficient in this regard.

The post-conviction court found that trial counsel failed to "object to clearly inflammatory and inappropriate statements" unsupported by the evidence made by the prosecutor during closing argument and failed to object to Agent Guy's being admitted as an expert in accident reconstruction and his "ventured opinions" about the Petitioner's and the victim's cars. The court found that Agent Guy had minimal experience, expertise, and education in the field.

-27-

The post-conviction court stated that it was most struck by trial counsel's lack of pretrial preparation and investigation. The court found that one day before the trial began, counsel moved for a continuance to retain an expert in forensic pathology and that counsel had more than one year to request funding for and to obtain an expert. The court found that counsel did not make any effort to seek or to procure a forensic pathologist to review the appropriate records. The court credited Mr. Acuff's testimony that the record showed counsel did not hire an investigator, did not show "any semblance" of an independent investigation, did not show evidence of significant preparation before the trial, and did not show counsel obtained independent experts to review the conclusions of the State's witnesses relative to the alleged automobile accident and the victim's cause of death. The court found that counsel's failure to prepare until mere days before the trial began, failure to obtain an investigator, failure to obtain independent expert opinions, and failure to conduct an independent investigation constituted deficient performance.

The post-conviction court, however, concluded that counsel's deficiencies did not undermine the confidence in the outcome of the Petitioner's trial. The court found that no evidence suggested an investigator would have changed the jury's verdict and noted that the witness statements were significant proof of the Petitioner's guilt. The court noted that counsel successfully mitigated the impact of the witnesses's testimony by excluding references to the more damaging portions contained in the statements and by impeaching the witnesses with their prior inconsistent statements. Relative to an independent forensic pathologist, the court found that no proof showed the outcome of the trial would have been different because no expert was presented at the post-conviction hearing. The court found that the evidence only presented the theory that the automobile collision caused the victim's injuries and was insufficient to establish prejudice. Relative to an independent accident reconstructionist, the court found that Mr. Norris's testimony called into question the accuracy of Agent Guy's testimony regarding the accident, or lack thereof, and presented evidence of what he would have done had he investigated the collision at the time it occurred. The court found, though, that no proof showed when the cars became unavailable to the defense for inspection and that in any event, the vehicles became unavailable before trial counsel's appointment on November 8, 2004. The court noted Mr. Norris's testimony that he had not seen enough information to form specific opinions about the collision. The court found that Mr. Norris did not present conclusions that were inconsistent or contradictory to Agent Guy's testimony at the trial but, rather, questioned the validity of Agent Guy's conclusions. The court found that the Petitioner did not present evidence that the victim's death was inconsistent with the testimony presented at the trial. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the

Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I.     Post-Conviction Court's Findings of Fact and Conclusions of Law

The Petitioner contends that the post-conviction court failed to make proper findings of fact and conclusions of law relative to his allegation regarding the manner in which the jury was empaneled. He argues that the court erroneously found that he did not present clear and convincing evidence relative to the improper method utilized to empanel the jury. The Defendant also contends that the court did not make findings of fact and conclusions of law relative to his allegation that he was denied his right to a fair and impartial jury because jurors were exposed to extraneous information during the trial. The State responds that the post-conviction court's findings and conclusions are sufficient.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

The post-conviction court "shall enter a final order, and . . . shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." T.C.A. § 40-30-111(b) (2012). Although a requirement, the failure of a post-conviction court to comply will not always result in a reversal of the court's judgment. *State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984); *see George v. State*, 533 S.W.2d 322 (Tenn. Crim. App. 1975). The intent of the General Assembly underlying the written order requirement "is to facilitate appellate review of the lower court's proceedings, and the failure to meet the requirement neither constitutes constitutional abridgment nor renders the conviction or sentence . . . void or

voidable." *Swanson*, 680 S.W.2d at 489. An appellate record containing transcripts of the post-conviction hearing and the trial and the post-conviction court's order stating the court's reasoning for denying relief is "sufficient to effectuate meaningful appellate review." *Id*.

The record reflects that the post-conviction court filed an extensive order denying post-conviction relief and that the appellate record contains the transcripts of the evidentiary hearing and of the trial. Relative to the Petitioner's allegation that he was denied his constitutional right to a fair trial based upon the method utilized to empanel the jury, the post-conviction court found that no evidence beyond mere allegation was presented at the evidentiary hearing and that the Petitioner failed to satisfy his burden. Relative to the Petitioner's allegation that he was denied his right to an impartial jury because jurors were exposed to extraneous information during the trial, the record reflects that the post-conviction court did not render specific findings of facts and conclusions of law. In any event, the court's failure to address in its order these allegations is inconsequential in this case.

Based upon review of the record, we conclude that the Petitioner's allegations are waived for failure to present them in the direct appeal of his convictions. *See* T.C.A. § 40-30-106(g) (2012). The Post-Conviction Procedure Act states that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been presented[.]" *Id*. Because the Petitioner did not present his allegations regarding violations of his constitutional rights to a fair trial and impartial jury in the appeal of his convictions, they are waived for purposes of post-conviction relief.

## II. Ineffective Assistance of Counsel

The Petitioner contends that he received the ineffective assistance of counsel. He argues that the post-conviction court erroneously concluded that counsel's deficient performance did not result in prejudice. He argues that he was prejudiced by counsel's failure to cross-examine and impeach properly Brad Stamey, failure to move for a mistrial when Detective Price mentioned the Petitioner's outstanding arrest warrants, failure to introduce the Petitioner's toxicology report to establish his intoxication at the time of the offense, failure to object to the prosecutor's improper closing argument, failure to present adequate mitigation evidence, and failure to present an expert accident reconstructionist. The State responds the Petitioner failed to show that any deficiency undermined the confidence in the jury's verdict.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As a preliminary matter, the Petitioner states in his brief that the post-conviction court erred by finding trial counsel credible, although handicapped by memory limitation and by finding that the Petitioner was not credible because of his appearance, demeanor, and motivation to bolster his post-conviction claims. This court does not reweigh evidence, reevaulate the evidence, or substitute its inferences for those drawn by the post-conviction court. *Henley*, 960 S.W.2d at 578-79. Furthermore, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction] judge." *Id.* at 579. With these principles in mind, we review the Petitioner's ineffective assistance allegations.

The Petitioner argues that the post-conviction court erred by finding that trial counsel effectively negotiated a plea offer of a reduction to second degree murder with an accompanying twenty-five-year sentence and directs this court to the Petitioner's evidentiary hearing testimony that he was never conveyed the twenty-five-year plea offer. A post-conviction court's findings of fact are binding on appeal, and this court must defer to them

"unless the evidence in the record preponderates against those findings." *Id.* at 578. The record reflects that the court resolved all conflicts in the evidence against the Petitioner and that trial counsel testified that although he could not recall whether he showed the Petitioner the November 10, 2005 letter containing the twenty-five-year plea offer, counsel knew he and the Petitioner discussed the offer. Likewise, counsel testified that the Petitioner rejected the offer and said, "This is nothing more than a reckless type deal." Counsel stated that the Petitioner wanted counsel to negotiate a reckless homicide plea agreement because the Petitioner did not intend to kill the victim and did not think he hurt the victim enough to cause the victim's death. We note the Petitioner testified that he rejected a twenty-year offer on the day the trial began. The evidence does not preponderate against the post-conviction court's finding that counsel effectively negotiated and conveyed the twenty-five-year offer to the Petitioner, and we conclude that counsel was not deficient in this regard.

The Petitioner also argues that the post-conviction court erred by finding that trial counsel effectively cross-examined trial witnesses. The Petitioner notes that counsel failed to cross-examine Brad Stamey relative to his inconsistent statements regarding when he arrived on the mountain, when the Petitioner arrived on the mountain, who Mr. Stamey saw when he went to the Golden Gallon store, when the Petitioner began "roughing up" the victim, and who placed the victim in the backseat of the car at the scene of the alleged collision. The record reflects that counsel conceded at the evidentiary hearing that Mr. Stamey made multiple inconsistent statements, including the statements identified in the Petitioner's brief, and that counsel could not recall his reasoning for not impeaching Mr. Stamey. Counsel noted the trial occurred years before the post-conviction hearing.

The trial transcript reflects that although trial counsel did not impeach Mr. Stamey with his prior inconsistent statements during his trial testimony, counsel nonetheless impeached Mr. Stamey with several inconsistent statements. For example, counsel impeached Mr. Stamey with his preliminary hearing testimony relative to whether Mr. Stamey was drinking alcohol on the night of the incident. Mr. Stamey testified at the preliminary hearing that he was drinking, although not intoxicated, but he testified at the trial that he was not drinking. Counsel also cross-examined Mr. Stamey relative to when the Petitioner arrived on the mountain, showing the unreliability of Mr. Stamey's perception of time. Mr. Stamey testified on direct examination that the Petitioner arrived between 2:00 and 3:00 p.m. but said on cross-examination the Petitioner arrived between 4:30 and 5:00 p.m. Mr. Stamey noted he was not wearing a watch and was unsure of the precise time. Likewise, counsel impeached Mr. Stamey with his statement to TBI Agent Guy and his preliminary hearing testimony during which Mr. Stamey stated that when he, his father, and Mr. Payne were returning from the Golden Gallon, Mr. Stamey saw the victim's car speeding away from an automobile collision involving the Petitioner, that Mr. Stamey saw the victim driving on the wrong side of the road, and that Mr. Stamey saw the victim almost cause a head-on

collision with Mr. Stamey's vehicle. At the trial, Mr. Stamey denied these events occurred. As a result, we cannot conclude that the evidence preponderates against the post-conviction court's finding that counsel effectively cross-examined Mr. Stamey. Although counsel did not impeach Mr. Stamey with every prior inconsistent statement, counsel successfully showed inconsistencies in Mr. Stamey's testimony reflecting upon his ability to perceive the events on the night of the killing and upon Mr. Stamey's credibility. We conclude that the post-conviction court properly concluded that counsel was not deficient in this regard.

The Petitioner further argues that he was prejudiced by trial counsel's failure to move for a mistrial after Detective Price testified that the Petitioner was taken into police custody because the Petitioner had outstanding arrest warrants. He points to Mr. Acuff's testimony to support his argument. However, the record reflects that Mr. Acuff could not conclude counsel was deficient by not requesting a mistrial. The post-conviction court found that counsel and the Petitioner did not discuss whether to request a mistrial and that counsel did not consider requesting any type of remedy. We note, though, that this court determined on appeal that admission of the evidence relative to the Petitioner's outstanding warrants did not entitle the Petitioner to plain error relief. We cannot conclude that counsel was deficient by failing to request a mistrial. The Petitioner has failed to show any deficiency undermined confidence in the proceedings. We note the overwhelming evidence that the Petitioner severely beat the victim in the presence of multiple witnesses.

The Petitioner argues that he was prejudiced by trial counsel's failure to present the toxicology report to show the Petitioner's intoxication and by failing to "file a *Ferguson* motion because of the lost evidence." The Petitioner argues that counsel's strategy was to mitigate the Petitioner's mental culpability and that the toxicology report would have supported counsel's chosen strategy.

The record reflects that the toxicology report was not received as an exhibit at the trial or during the post-conviction hearing. Testimony relative to the report reflects that although the report was included in the State's discovery package, the report was lost for unknown reasons. Counsel did not recall presenting the report at the trial, and no evidence was presented at the evidentiary hearing regarding the result of the analyses. However, the record contains the search warrant issued for the Petitioner's blood and hair and reflects it was signed by the judicial magistrate on July 25, 2002, five days after the incident in the present case.

Although we do not condone the loss of the toxicology report, we cannot conclude that the loss of the report and failure to present the results at the trial constituted deficient performance. The Petitioner's blood alcohol concentration was determined at least five days after the victim's death, would have had no evidentiary value at the trial, and would not have

been relevant to show the Petitioner's conduct was mitigated by intoxication. The evidentiary insignificance of the report would also have negated the need for a jury instruction relative to lost or destroyed evidence. *See State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999). Relative to prejudice, this court will not speculate on the results of the analyses. We note, as well, that the jury was provided an intoxication instruction during the trial court's final jury charge.

The Petitioner also argues that trial counsel's failure to obtain and present experts in the fields of accident reconstruction and forensic pathology resulted in prejudice. Relative to an accident reconstruction expert, the record reflects that Agent Guy testified at the trial that broken taillight pieces were lying under the victim's car when it was parked outside the Petitioner's parents' home and that Agent Guy concluded the damage occurred where the car was parked, not at the scene of an automobile collision. Agent Guy also testified that the Petitioner's car showed slight damage to the rear bumper. Although Agent Guy was not received as expert, his relevant testimony was offered based upon his experience investigating automobile collisions. The record reflects, and counsel agreed, that counsel did not object to the testimony. Counsel conceded that he did not know Agent Guy would testify in this capacity and thought Agent Guy would only testify about the photographs of the vehicles. Counsel agreed that the State attempted to show the Petitioner was untruthful in his pretrial statement in which he claimed an automobile collision occurred before the assault. Counsel, likewise, agreed he was unable to cross-examine Agent Guy about his conclusions.

The record reflects that although trial counsel and the Petitioner discussed an automobile collision causing some of the victim's injuries, counsel did not consider pursuing the theory because of the witness statements relative to the brutal beating inflicted by the Petitioner and because of the medical examiner's conclusions regarding the victim's extensive injuries. Although this court gives deference to counsel's chosen defense strategy, deference is only provided after counsel engages in an adequate investigation to determine the viability of possible defenses. *See Baxter*, 523 S.W.2d at 933 (stating counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed"). Counsel did not view the relevant crime scenes or consult an expert to determine whether it was a viable defense to present evidence that at least some of the victim's injuries were caused by an alleged automobile collision. The record supports the post-conviction court's finding that counsel did not engage in any meaningful pretrial investigation, and the court properly concluded that counsel's failure to investigate relative to the alleged collision constituted deficient performance.

However, the Petitioner has failed to establish he was prejudiced by counsel's deficiency. Agent Guy testified at the trial that it was possible the victim's car hit the rear of the Petitioner's car despite the varying amount of damage to both cars. As a result, evidence

of a collision was presented to the jury. More importantly, however, Mr. Norris, the Petitioner's expert accident reconstructionist, was unable to render conclusions contrary to the State's proof presented at the trial. Although Mr. Norris's testimony called into question the accuracy and validity of Agent Guy's conclusions, Mr. Norris's testimony focused on what he would have done to investigate the collision had he been retained near the time of the collision. Mr. Norris had not received enough information to form specific opinions about the collision. We note the overwhelming evidence of the Petitioner's guilt based upon the witness testimony relative to the Petitioner's beating the victim, his failure to stop beating the victim when warned the victim had suffered enough, and the Petitioner's stating that he would kill the victim during the assault. As a result, the post-conviction court did not err in determining that the Petitioner failed to establish that the outcome of his trial would have been different had the defense presented an expert accident reconstructionist at the trial.

Relative to an independent forensic pathologist, the record reflects that the medical examiner testified at the trial that the victim's cause of death was blunt force trauma and noted the victim's extensive injuries, including contusions, abrasions, and lacerations to the head and neck. The victim suffered fractures to the thyroid cartilage and hyoid bone, which were consistent with strangulation or significant blunt force trauma. Trial counsel testified at the post-conviction hearing that he did not did not hire an independent pathologist to review the medical examiner's findings and conclusions. We note that the record reflects counsel attempted to obtain funds for such an expert one day before the trial, which was denied by the trial court. Counsel said that after reviewing the witness statements regarding the assault and the autopsy report regarding the extensive head and neck injuries, he concluded that the victim's injuries were not the result of an automobile collision. Counsel conceded he was not a pathology expert. We conclude that although counsel might have doubted whether the victim's injuries were caused by an automobile collision, counsel had a duty to investigate whether the injuries could have been inflicted by a collision. An adequate investigation in this regard would have included obtaining the opinion of an independent forensic pathologist. Therefore, the record supports the post-conviction court's conclusion that counsel was deficient by failing to investigate, which included obtaining a medical expert to review the autopsy report.

However, the Petitioner has failed to establish he was prejudiced by trial counsel's failure to obtain an independent forensic pathologist because the Petitioner did not present such an expert at the post-conviction hearing. When a petitioner contends that counsel was deficient by failing to present an expert witness, the relevant expert should be presented at the post-conviction hearing. Generally, "this is the only way the petitioner can establish that the failure to . . . call the witness . . . resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App.

1990). This court will not speculate regarding the conclusions of an independent medical expert, and therefore, the Petitioner is not entitled to relief.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE